IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**RODNEY WAYNE BREWER,**

      **Plaintiff,**

      v.                             Civil Action No.: 5:11-cv-106

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION THAT CLAIMANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED AND COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT BE GRANTED

### I. Introduction

A.    Background

Plaintiff, Rodney Wayne Brewer,[1] ("Claimant"), filed his Complaint on July 29, 2011, seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of Social Security ("Commissioner").[2] Commissioner filed his Answer on October 11, 2011.[3] On November 14, 2011, Claimant filed his Motion for Summary Judgment.[4] Commissioner filed his Motion for Summary Judgment on December 12, 2011.[5] Claimant did

---

[1] Although the instant complaint was filed on behalf of "Rodney Wayne Brewer" many of the records indicate his name is "Rodney Whyne Brewer," and this Court is unable to discern which is the correct. Additionally, Claimant's counsel erroneously refers to him as "Martin Brewer" on page eight of Plaintiff's Motion for Summary Judgment.

[2] Dkt. No. 1.

[3] Dkt. No. 11.

[4] Dkt. No. 14.

[5] Dkt. No. 16.

not file a reply.

B.	The Pleadings

    1.	Claimant's Motion for Summary Judgment & Memorandum in Support

    2.	Commissioner's Motion for Summary Judgment & Memorandum in Support

C.	Recommendation

I recommend that:

    1.	Claimant's Motion for Summary Judgment be **DENIED** because the ALJ posed proper hypothetical questions to the vocational expert and because the ALJ properly supported his reasons for discrediting portions of Claimant's testimony.

    2.	Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II. Facts

A.	Procedural History

Claimant filed an application for Supplemental Security Income on November 27, 2007, alleging disability since January 1, 2007 due to arthritis, chronic pain, knee and arm injuries, headaches, bipolar disorder, anxiety, and sleep disorder. (Tr. 41-42; 161-64). Claimant's initial application for disability benefits was denied on May 6, 2008 and his request for reconsideration was denied on September 11, 2008. On April 20, 2009, Plaintiff filed another application for benefits, alleging disability since April 20, 2009. (Tr. 165-68). Claimant's initial application for disability benefits was denied on July 6, 2009 and his request for reconsideration was denied on September 24, 2009. (Tr. 15). On October 20, 2010, Claimant had a hearing before an ALJ, (Tr. 32-90), and the ALJ granted Plaintiff's request to reopen the application for Disability Insurance

Benefits opened on November 27, 2007. (Tr. 40).

On January 20, 2011, the ALJ issued a decision adverse to Claimant, finding that he was not disabled from 2007 until the date of the decision. (Tr. 15-31). Claimant requested review by the Appeals Council but was denied on June 10, 2011. Claimant filed this action, which proceeded as set forth above, having exhausted his administrative remedies.

B.      Personal History

Claimant was born on January 8, 1973 and was thirty-seven years old on the date of the October 20, 2010 hearing before the ALJ. (Tr. 43). Claimant completed the eighth grade but received his GED in 1992. (Tr. 50). Claimant has prior work experience hanging vinyl siding on homes, as a painter, and working at a laundry, among other work experience. (Tr. 52-55).

C.      Medical History

On December 7, 2006, Corey G. Solman performed a lateral retinacular release of his right knee. (Tr. 379-80). On February 2, 2007, Claimant had the same surgery on his left knee, and reported on February 11, 2004, that he had minimal swelling, no numbness, and excellent range of motion. (Tr. 320-21, 362). On April 10, 2007, Claimant had left knee pain so Dr. Solman gave him a cortisone shot. (Tr. 349). Because of continued pain, on May 1, 2007, Claimant had arthroscopy on his left knee to clean out scar tissue. (Tr. 330).

On September 23, 2007, Claimant was in a motor vehicle accident and required surgery for a compound fracture of his left arm and a dislocated elbow. (Tr. 419-20, 495). Dr. Lucas J. Pavlovich, M.D., performed the surgery and reported that the follow-up x-rays showed the elbow was properly aligned. (Tr. 391). On September 24, 2007, Dr. S. Shehzad Parviz, M.D., from Valley Creek Health Care, noted they had gotten complaints from the pharmacy and from Dr.

3

Pavlovich's office regarding Claimant's possible abuse of narcotics for pain control. (Tr. 397). On October 23, 2007, Dr. Pavlovich determined that Claimant had full finger mobility, intact sensation in his fingers, and no motor deficits, even though Claimant complained of elbow pain, decreased sensation, and numbness. (Tr. 383, 387, 389). On November 6, 2007, Claimant saw Dr. Pavlovich with complaints of paresthesia of the thumb, index and long finder, causing Dr. Pavlovich to keep him in his cast for an additional two weeks and have a repeat x-ray once it was off. (Tr. 387). On November 20, 2007, Claimant again complained of pain in his left arm and numbness in his hand (Tr. 386).

On January 3, 2008, Claimant again complained to Dr. Pavlovich of pain in his elbow and forearm. (Tr. 581). On January 21, 2008, Dr. Sharon Joseph, Ph.D., performed a state agency mental examination. She found that his concentration, recent memory, and judgment were moderately impaired, and she also found that his mood was depressed and anxious. (Tr. 461-64). She also noted, however, that he was alert, oriented, cooperative, and that he did not have any thinking disturbances, was not preoccupied, and had no compulsions. (Tr. 461-64). She also noted that Claimant drank four drinks per day and had used crack, heroin, methamphetamine, and marijuana in the past. (Tr. 461-64). She disagreed that Claimant was bipolar and found that he instead had a mood disorder with "some anxiety." (Tr. 461-64).

On January 23, 2008, Dr. Parviz completed a nerve conduction and EMG study, which showed no nerve problems, and Claimant's x-rays showed inadequate ulna fracture consolidation but normal forearm and elbow alignment (Tr. 580, 442-43). On January 29, 2008, Dr. Steven Toney, M.D., stated he would refuse to manage Claimant's bone grafting post-operative pain, if he chose the surgery, because he suspected Claimant of narcotic abuse. (Tr. 517).

4

On January 31, 2008, Dr. G. David Allen, Ph.D., performed Residual Functional Capacity ("RFC") Assessment and Psychiatric Review Technique assessments and found that Claimant could work so long as there was little social demand and he was charged with routine activities. (Tr. 465-68). He also found Claimant had mild daily living restrictions, moderate difficulties in social functioning, concentration, persistence, or pace, and no extended duration decompensation episodes. (Tr. 469-82).

On February 15, 2008, Dr. Pavlovich suggested an iliac crest bone graft and ulna plating, and Claimant agreed to the surgery. However, even after the surgery, Claimant continued to experience pain and hypersensitivity at the ulna fracture site. (Tr. 560, 563-66, 568-74).

On April 8, 2008, Claimant was said to be doing "very well" by Dr. Pavlovich, (Tr. 575). On April 9, 2008, Claimant was referred to Kip Beard, M.D., by the state agency. He noted that Claimant had only mild knee pain and intermittent crepitus with no swelling or popping in his left knee and that in his right knee, he has no pain or swelling (Tr. 499-500). He also noted that Claimant stood without assistance, stepped up and down from the exam table with no trouble, and walked with a mild limp. (Tr. 499-500). He also found he had a moderate range of motion limitations, slight weakness, and slight atrophy. (Tr. 499-500). Dr. Beard also noted that Claimant was drinking alcohol every day for pain control and that he was smoking four to five cigarettes a day. (Tr. 496).

On April 25, 2008, Claimant had an RFC Assessment by Fulvio Franyutti, M.D. Dr. Franyutti found Claimant could occasionally carry or lift twenty pounds, could frequently lift or carry ten pounds, could stand or walk for six hours at a time, and could sit for six hours in an eight-hour workday (Tr. 501-08). On May 8, 2008, Claimant went to the Appalachian

5

Community Heath Center stating that he had occasional crying episodes, tried not to go into stores, and had poor concentration. He was also given a Global Assessment of Functioning ("GAF") score of 55. (Tr. 586-90). On May 20, 2008, Dr. Pavlovich noted Claimant was tender over his ulnar but did not have radial-sided pain. (Tr. 571).

On August 4, 2008, Claimant underwent a left ulna ORIF and iliac crest bone graft. (Tr. 751). On August 18, 2008, Joseph Kuzniar, Ed.D., performed another mental RFC assessment and noted Claimant was not markedly limited in any category. (Tr. 534-51). He also noted that Claimant could understand and remember routine instructions. In a second RFC assessment on August 29, 2008, Thomas Lauderman, D.O., added that Claimant should be limited to only lifting or carrying five pounds with his left arm and only pushing or pulling with his right hand. (Tr. 552-59).

On October 15, 2008, Claimant was diagnosed by Scott M. Harris, D.C., with cervical, thoracic and sacral segmental joint dysfunction. (Tr. 718). On October 18, 2008, Claimant went to Davis Memorial Hospital with left arm pain from an altercation, and on October 21, 2008, an x-ray of the arm showed it was fractured. (Tr. 745). On October 30, 3008, Claimant was diagnosed with cervical, thoracic, lumbar and sacral segmental joint dysfunction. (Tr. 718), and on November 4, 2008, Claimant was diagnosed with complex regional pain syndrone. (Tr. 688). On November 25, 2008, in a comprehensive psychiatric diagnostic interview, Dilip Chandran, M.D., diagnosed Claimant with bipolar disorder, generalized anxiety disorder, and alcohol abuse. He was also given a GAF score of 60. (Tr. 592-94, 701).

On April 30, 2009, Claimant saw Dr. Mohamed Iqbal, M.D., with complaints of dull and achy left arm pain, which he rated as being between a three and a four out of ten on a pain scale.

6

(Tr. 629-38). Dr. Iqbal diagnosed Claimant with complex regional pain syndrome and told Claimant to continue taking Vicodin for the pain. (Tr. 629-32). He noted that he thought Claimant was able to perform other full time work not requiring the use of his left arm. (Tr. 629-38).

On May 28, 2009, Dr. Joseph, on her state agency mental status examination report, again noted that Claimant was depressed, but that he was alert, oriented, cooperative, and did not have any suicidal ideations. She did note, however, that his recent memory was markedly impaired and that his concentration and socialization were mildly impaired. (Tr. 596-99).

On June 2, 2009, Bob Marinelli, Ed.D., filled out a Psychiatric Review Technique form and found that Claimant did not have severe mental impairments. He noted that he had only mild restrictions to daily living, social functioning, and concentration and did not have any extended duration decompensation episodes. (Tr. 600-13).

On June 13, 2009, Plaintiff was referred to Dr. Arturo Sabio, M.D., by the state agency. Dr. Sabio noted his right knee was tender and had crepitus. His left elbow had some swelling, tenderness, and stiffness, and his left hand was weak. His motor strength scored 5/5 in the upper and lower extremities. (Tr. 614-18). Dr. Sabio also diagnosed him with "ankylosis of the left elbow, status post open fracture of the left elbow and ulna," "left arm palsy secondary to right elbow injury," and "degenerative arthritis in both knees." (Tr. 617).

In a third RFC assessment on July 2, 2009, Dr. Atiya M. Lateef, M.D., agreed with the previous assessments but noted that Claimant had no manipulative limitations with his right arm. With the left arm, she noted that Claimant had limited lefthand handling and fingering. (Tr. 621-28). On July 22, 2009, on a pain assessment form, Claimant stated he did not feel depressed or

hopeless, that he took medications for his anxiety, and goes to see a mental health counselor four times each year. (Tr. 60-61). In a fourth RFC assessment on Semptember 23, 2009, Dr. Franyutti agreed with the other assessments. (Tr. 653-60).

On January 13, 2010, Claimant was diagnosed with segmental dysfunction of the cervical region. (Tr. 712). On January 15, 2010, Mohammed Fahim, M.D., Ph.D., concluded that Claimant had left upper extremity pain, neuropathic pain of the left upper extremity with possible diagnosis of complex regional pain syndrome, nonunion fracture of the left forearm, gastroesophageal reflux disease, bipolar disorder, and headaches, and he recommended a series of left stellate ganglion block injections. (Tr. 708-10). On January 20, 2010, Charles Scharf, M.D., diagnosed Claimant with Bipolar disorder with hypomania and antisocial personality. (Tr. 680).

On March 1, 2010, Matthew J. Dietz, M.D., diagnosed Claimant with a fibrous union of the left ulna. (Tr.703-705). On March 5, 2010, with complaints of hypersensitivity and decreased range of motion and motor strength, Plaintiff saw Mohammed Fahim, M.D., at the Davis Memorial Hospital Pain Management Center. Dr. Fahim increased Claimant's neurotin and scheduled him for a stellate ganglion block injection. (Tr. 706-11). On March 15, 2010, Dr. Scharf determined the medications Claimant was taking for his psychiatric condition were not producing any side effects. (Tr. 676). On March 16, 2010, Claimant went to the emergency room at Davis Memorial Hospital after suffering injuries from an ATV accident. (Tr. 762). On March 21, 2010, Joseph Prudhomme, M.D., at the West Virginia University Department of Orthopaedics examined Claimant's left arm. He found Claimant could flex 85 degrees, extend to almost full extension, could fully supinate, but had trouble pronating. (Tr. 732-34). Claimant's

8

fingers demonstrated good distal sensation, and the x-rays showed incomplete hearing of the ulna fracture. (Tr. 732-35). Dr. Prudhomme told to Claimant to take vitamin D to speed up the healing process. (Tr. 730-31). On June 1, 2010, Claimant stated his neck pain had improved but that his lower back pain was becoming worse. (Tr. 714). On July 12, 2010, Dr. Scharf reported that Claimant was calm, sleeping well, and was less irritable as a result of his current medications. (Tr. 675). On July 26, 2010, Claimant reported significant improvement in his neck and lower back pain, although he noted an increase in mid-back pain. (Tr. 715). On August 12, 2010, Dr. High prescribed Claimant a straight cane, although he noted his extremities were normal. (Tr. 806, 813). On September 2, 2010, Claimant was diagnosed by Dr. Pavlovich with patellofemoral chondral wear and pain. (Tr. 687).

On October 19, 2010, Charles Scharf, M.D., completed a mental impairment questionnaire about Claimant. He noted Claimant had no useful ability to function in all areas and thought Claimant would miss more than four days of work each month due to his bipolar disorder. (Tr. 722-28).

D.  Testimonial Evidence

At the hearing, Claimant testified that he was in a motor vehicle accident in 2007, resulting in a broken left arm, a separated left elbow, and a fractured left wrist. (Tr. 56-57). He stated that now he cannot straighten that elbow, cannot pivot his wrist, and still has pain in that arm. (Tr. 57). He also testified that he cannot do anything with his left arm, for example turning a knob to open a door. (Tr. 58). However, he testified that he is still able to use his right arm, although sometimes he has trouble judging how hard he is gripping something with that hand. (Tr. 59). Claimant also testified that he has had surgery on both knees and that Dr. Pavlovich

9

recommends that he have surgery on them again. (Tr. 60).

Claimant testified that he has been diagnosed with bipolar disorder, that he is receiving treatment for it by Dr. Scharf, and that he goes to see him approximately every three months. (Tr. 61-63). He testified that he is taking Neurontin, Vicodin, Zantac, Paxil, Klonopin and Divalproex for his bipolar disorder, depression, anxiety, pain and acid reflux and that he also goes to see Dr. Scharf approximately every three months. (Tr. 61-63). He also testified that he has migraines two to three times per week, and has been having them consistently for the last six years. (Tr. 64). He used to be on medication for the migraines but he is not taking any medication for them currently. (Tr. 71).

He testified that he occasionally has manic episodes, even when he is taking is medicines, that are brought on by stress or being around people. (Tr. 71). He testified that "while [he] was having [his] manic episode, [he] beat up [his] son, [he] beat up his home care worker, tore up the house, and woke up in jail." (Tr. 71). He also testified that he has frequent panic attacks, about one each day, although sometimes more, and they cause him to feel as if he is having a heart attack. (Tr. 74-76).

At the hearing, the ALJ also posed the following hypothetical to the VE:

> Assume a hypothetical individual with the same age, education, and work experience as the claimant, who retains the capacity to perform light work, defined as being able to lift/carry up to 20 pounds occasionally, and 10 pounds frequently, and able to stand and walk for up to six hours, and sit for up to six hours in an eight hour work day, with normal work breaks, with the following limitations: occasional balancing, stooping, crouching, crawling, climbing of ramps and stairs. No kneeling or climbing ladders, ropes or scaffolds. Occasional left-sided handling and fingering, where the person is right-hand dominant. Occasional reaching in all directions. No balancing on heights. Work that avoids concentrated exposure to extreme temperatures and vibrations. Work that involves no exposure to hazards, including operation of dangerous and moving machinery at unprotected heights. Work that is limited to simple, routine and repetitive one, two, and three step tasks. Work limited to a low-stress environment, defined as

10

having only occasional decision-making required and only occasional changes in the work setting. Work that has only occasional interaction with the public, co-workers, and supervisors. Can such an individual perform the past work of the claimant as it was actually performed or as it is customarily performed, per the DOT?

The VE then responded "No, your honor." However, when asked if there are other jobs in the regional or national economy that such an individual could perform, the VE responded with:

Photographic machine operator, which is recognized under Dictionary of Occupational Title number of 207.685-018. Light, unskilled, with a specific vocational preparation of two. We're looking at 80,000 nationally, 900 regionally. Folding machine operator. Dictionary of Occupational Title number 208.685-014. Light, unskilled, SVP 2. 75,000 nationally. In the region, 300. Collator operator. Dictionary of Occupational Title number 208.685-010. Light exertion, specific vocational preparation of two, therefore unskilled. 55,000 nationally, 100 regionally. That is a sampling at the light exertional [level].

Then the ALJ posed a second hypothetical to the vocational expert:

Now, let's assume that same hypothetical individual who retains the capacity to perform sedentary work, defined as lifting up to 10 pounds occasionally, standing and walking for about two hours, and sitting for up to six hours in an eight hour work day, with normal breaks. With all the same non-exertional limitations previously given. Are there jobs in the regional and national economy that such an individual could perform?

The VE then responded that:

The following fit within the hypothetical. Laminator. DOT number 690.685-258. Sedentary, unskilled, with a specific vocational preparation of two. 75,000 nationally, 400 regionally. Ink printer. Dictionary of Occupational Title number 652.685-038. Sedentary, with a specific vocational preparation of two. 75,000 national, 200 regional. Plastic design applier recognized under DOT 690.686-046. Sedentary, unskilled, special vocational preparation of one. 16,000 national, 300 regional.

Then the ALJ asked the VE:

Now, at either exertional level, the light or the sedentary, would a sit-stand option allow a person to alternate between sitting and standing positions every 30 minutes, throughout the workday? Would your answer to either of the two hypotheticals be different?

The VE replied:

11

No, your honor. The photographic machine operator, the folding machine operator, collator operator, which were the light positions, the light hypothetical, allow a sit-stand option. And likewise, the laminator, ink printer, plastic design applier, the sedentary hypothetical, would also allow a sit-stand option.

Then, the ALJ asked the VE about adding additional limitations:

Now, at either exertional level, would the added limitation of no left-sided handling, fingering, or reaching, including overhead reaching, this is left-sided only, where the person is right-side dominant. Would that affect your answer on either exertional level?

The VE responded:

A photographic machine operator could be done with one hand, so that would not have an effect. The folding machine operator, collator operator, would need assistance with the non-dominant hand, so therefore, would be prevented, if there was no way to use that at all, not even for assistance. With the laminator, ink printer, and plastic design applier, you're monitoring a machine, primarily. And to load, anything you need to load could be done with one hand. So therefore, I don't see that as a difficulty.

E.  Lifestyle Evidence

At the hearing before the ALJ, Claimant testified that he lives with a live-in home health aid, and that before his father passed away, he was living in a camper on his father's property. (Tr- 44-45). He also testified that his home health aid makes his food for him, reminds him to take his medications, helps him button his pants and tie his shoes, and helps him in and out of the tub. (Tr. 47, 73-74). He testified that he takes two naps a day, usually because his medications have made him drowsy, watches television, and listens to the radio. (Tr. 68-69). His father also submitted a function report indicating that he sometimes mowed and did chores around the house (Tr. 261-62),

Claimant also testified that he does not have a driver's license and that he lost his two years ago following a second DUI conviction. He testified that he served four and a half months in jail for the DUI conviction. He also testified that he was in prison before for burglary and has

12

been to rehabilitation for alcoholism. (Tr. 50).

### III. The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant's brief alleges two instances of error on the ALJ's part: 1) the Commissioner erred as a matter of law by finding Claimant is capable of work that exists in substantial numbers in the national economy because he relied on the VE's testimony, which was based on an incomplete hypothetical, and 2) the Commissioner erred as a matter of law by improperly discounting Claimant's credibility without providing sufficient reasons supported by the evidence in the case record.

Commissioner contends the ALJ's decision is supported by substantial evidence and should therefore be affirmed. Specifically, Commissioner responds that: 1) the ALJ's hypothetical to the VE was proper because it must only include those limitations supported by the record, and Claimant's need for a cane was not supported by the record, and 2) the ALJ properly explained why he discounted Claimant's credibility.

B.      The Standards.

1.      Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

  2. Judicial Review. Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

C. Discussion

  1. Whether the ALJ Erred in Eliciting Testimony from the Vocational Expert with an Incomplete Hypothetical

Claimant contends the ALJ used an incomplete hypothetical because it failed to include all of his limitations, specifically his need to use a cane. The Fourth Circuit Court of Appeals has held that, while questions posed to a vocational expert must fairly set out all of the Claimant's impairments, the questions need only reflect those impairments supported by the record. Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005). The Court has also stated that the hypothetical question may omit non-severe impairments but must include those that the ALJ finds to be severe. Russell v. Barnhart, 58 Fed. Appx. 25, 30; 2003 WL 257494, at 4 (4th Cir. Feb. 7, 2003). Moreover, based on the evaluation of the evidence, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)). Moreover, the ALJ is afforded "great latitude in posing hypothetical questions." Koonce v. Apfel, 166 F.3d 1209; 1999 WL 7864, at *5 (4th Cir. 1999) (citing Martinez, 807

14

F.2d, at 774). See also Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988); Hammond v. Apfel, 5 Fed. Appx. 101,105; 2001 WL 87460, at *4 (4th Cir. 2001).

Here, the ALJ properly omitted Claimant's cane from the hypothetical. In this case, the ALJ stated that "the medical evidence of record fails to support the claimant being in need of a cane to ambulate for 12 continuous months in light of his activities and him being observed not utilizing an ambulatory advice at examinations," (Tr. 30) so he did not include this limitation in the hypothetical posed to the VE. There is substantial evidence supporting the ALJ's decision not to include this limitation. Although Claimant may have been prescribed a cane, there is other evidence in the record indicating this was not medically required and that he was not using it to walk. For example, on January 21, 2008, Plaintiff saw Dr. Joseph and reported to him that he was able to vacuum, cook meals, go up and down the stairs, and drive. (Tr. 463). April 9, 2008, Dr. Beard noted that Claimant was present "without ambulatory aids and did not require them." (Tr. 499-500). He also noted that "the Claimant is able to stand unassisted, able to arise from a seat, and step up and down from the examination table without difficulty." (Tr. 497). On June 13, 2009, Plaintiff saw Dr. Sabio, but during that appointment he was wearing a knee brace but was not using a cane to walk. (Tr. 614-19). Additionally, when Claimant filled out an undated Function Report, he noted that a brace/splint had been prescribed in 2007, but he did not check the box indicating that a cane had been prescribed. (Tr. 293). On a second Function Report, Claimant did check the box indicating he used a cane and knee brace, however he only indicated that the brace had been prescribed by a doctor. On June 10, 2009, Claimant saw Dr. Sabio, and he noted that Claimant walked with an antalgic gait and had a knee brace on his right knee, but he made no mention of claimant's use of a cane. (Tr. 615). Additionally, Plaintiff did not

15

mention his need to rely on a cane, even when providing a description of his daily activities, during his hearing before the ALJ. Here, claimant's need to rely on a cane for ambulatory assistance is not supported by substantial evidence in the record, so the ALJ did not err in failing to include it in the hypothetical posed to the VE.

    2.    <u>Whether the ALJ Erred by Discounting Claimant's Credibility Without Providing Specific Reasons Supported by the Evidence in the Record</u>

Next, Claimant contends that the ALJ erred as a matter of law in making a credibility determination that is not based on substantial evidence. The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints in <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996). Under <u>Craig</u>, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. <u>Id.</u> at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment." <u>Id.</u> at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. <u>Id.</u> at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. <u>Id.</u>

The regulations set forth certain factors for the adjudicator to consider to determine the extent to which the symptoms limit the claimant's capacity to work, including: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate

16

pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. 404.1529(c) and 416.929(c) (2010). SSR 96-7p also sets forth certain other factors for the adjudicator to consider when determining credibility. These factors include medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by medical sources; and statements and reports about claimant's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the claimant's symptoms and how the symptoms affect the individual's ability to work.

Furthermore, courts have held that "[b]ecause [the ALJ has] the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

Here, in coming to his conclusion that Claimant was not entirely credible, the ALJ complied with the two-part test in Craig. First, the ALJ found, in accordance with step one, that "[t]he claimant has medically determinable impairments that could reasonably be expected to

17

cause some of the symptoms described, and the undersigned believes that the claimant does experience symptoms related to such impairments." (Tr. 21). However, the ALJ, pursuant to the second part of the test, delineated each of his reasons for discrediting Claimant's testimony as to the frequency or degree of severity alleged. The ALJ, for example, stated his reluctance to credit the testimony of Claimant because he is a narcotic addict. He states:

> One may reasonably conclude than an individual who has demonstrated long-term reliance upon addictive medication is more likely than not to report such ongoing symptoms as will facilitate continued obtainment of such medications, even in the absence of actual symptoms of such debilitating severity as would warrant the need for such medications. A medication-dependent/reliant individual is also unlikely to minimize, acknowledge or report such a decrease in the debilitating severity of symptoms as would result in a decrease in dosage or the discontinuation of highly addictive medications, even if such symptoms have actually subsided...The claimant's long-term opiate use may be fairly considered in evaluating the credibility of his related, subjective complaints.

(Tr. 20).

The ALJ stated he discredited some of Claimant's testimony because the record contains substantial inconsistencies with regard to the Claimant's statements about the severity of his limitations regarding daily activities. The ALJ then described in detail the discrepancies between his first and second applications and the limitations he claimed, and the ALJ also highlighted the number of activities Claimant stated he engages in that are inconsistent with his allegation that he is not able to maintain sustained employment. (Tr. 20-21).

The ALJ went on to detail inconsistencies in the record regarding Claimant's medical and employment history. First, he noted that although Claimant reported he had been prescribed a splint and cane in 2007, at a 2008 examination he was not using ambulatory aids. (Tr. 21). Further, the ALJ noted that in 2010, Claimant stated he had not used marijuana in ten years, but he reported at a 2008 examination that he had used marijuana two months prior to the

18

examination. (Tr. 21). The ALJ noted that Claimant has been inconsistent in his reports of alcohol consumption. (Tr. 21). Then, over the course of eight pages, the ALJ evaluated the various medical reports and other evidence presented in the record and concluded that Claimant "has a treatment history which fails to demonstrate a totally disabling condition." (Tr. 22-29). For those reasons, the ALJ concluded that Claimant is not entirely credible and did not fully accepts his subjective statements about symptoms and limitations. Because substantial evidence supports a finding that Claimant's subjective statements were not entirely credible, the ALJ has not erred.

For the above reasons, Claimant's assertions do not warrant relief.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED.**
2. Commissioner's Motion for Summary Judgment be **GRANTED.** The ALJ posed a proper hypothetical to the VE and the ALJ properly evaluated and stated his reasons for his credibility determination.

Any party who appears *pro se* and any counsel of record, as applicable, may, **on or before February 4, 2012**, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

<u>DATED</u>: January 20, 2012

      /s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE